985 A.2d 156

E. Daris WARSHAM

v.

JAMES MUSCATELLO, INC.

No. 1041, Sept. Term, 2008.

Court of Special Appeals of Maryland.

Dec. 30, 2009.

622

624

H. David Leibensperger (Mark Nee, Berman, Sobin, Gross, Feldman & Darby, LLP on the brief), Gaithersburg, for appellant.

Amy Leete Leone (Scott D. Nelson, McCarthy Wilson on the brief), Rockville, for appellee.

Panel: HOLLANDER, MATRICCIANI, and JAMES A. KENNEY, III (Retired, Specially Assigned), JJ.

HOLLANDER, J.

This "slip and fall" case arises from an incident that occurred on March 9, 2005, when E. Daris Warsham, appellant, fell as he attempted to salt an icy area on the property of James L. Muscatello, Inc., appellee, his employer's landlord. Appellant subsequently filed a negligence suit against the landlord on April 27, 2007, to recover for injuries he sustained in the fall.[1] The Circuit Court for Montgomery County granted the landlord's motion for summary judgment on May 21,

---

1. Appellant's spouse, Kristi Warsham, initially was a co-plaintiff, claiming loss of consortium. Her claim was voluntarily dismissed.

2008, ruling that the suit was barred by the doctrines of contributory negligence and assumption of the risk.

This appeal followed. Appellant presents one issue, which we quote:

> Whether a plaintiff is contributorily negligent or assumes the risk as a matter of law where the plaintiff falls on ice, negligently left by the defendant, while in the process of remedying the icy condition by salting it[.]

For the reasons set forth below, we shall affirm.

### FACTUAL AND PROCEDURAL BACKGROUND[2]

At the relevant time, appellant was employed by Master's, Inc.[3] ("Master's"), located at 7901 Beechcraft Avenue, # A, in Gaithersburg (the "Property"). The Property, located in a warehouse type building, was leased by Master's from James L. Muscatello, Inc. (the "Company" or the "landlord"). Master's and the Company shared use of the parking lot.

On March 9, 2005, appellant arrived at work between 6:00 a.m. and 6:30 a.m. The weather was cold, but there was no precipitation, nor had there been any on the previous day. According to appellant, mornings are the busiest time at work, because of deliveries and because Master's contractors set up

---

**2.** Our factual summary is derived largely from information presented to the court in connection with the summary judgment motion, such as depositions and other discovery material. The parties did not submit the deposition of James Muscatello, although an excerpt of his deposition is included in appellant's reply brief. On information and belief, Mr. Muscatello was the owner of James L. Muscatello, Inc.

**3.** Appellant's answers and supplemental answers to interrogatories state that appellant was employed by "Master's, Inc." Neither the record nor the briefs indicate the nature of Master's business. In his answers to interrogatories, appellant described his job, as follows:

> [Appellant] was the Fire Protection Warehouse Manager and Purchasing Manager. [Appellant] was responsible for keeping thte [sic] inventory stocked and to be able to provide field employees' [sic] with material to complete jobs. [He] was also in charge of the accounts and work with vendors on pricing and supply. [He] set up deliveries to various job sites as well as getting the left over material re-stocked.

their equipment "for the day." [4] However, appellant claimed that some of Master's field technicians were told by their supervisor that they should not report to work until after 10:00 a.m., apparently due to concern about the weather.[5]

Upon his arrival at work, appellant "was able to clearly see a large icy area" on the parking lot, which he described as a "fishing pond" located "[i]n front of [his] bay door...." He explained that there was an ongoing problem of "standing water" accumulating outside his office, dating at least to the Fall of 2004, when he began working at Master's. He claimed that vendors and employees of Master's often complained about "having to trek through the water." Appellant claimed that he notified his boss, Joe Mathews; [6] the safety coordinator, Gwen Wathen; and others, including appellee's assistant, "Al," about the pooling of water in the parking lot.

According to appellant, on the date in question the pool of water had "iced over." Appellant described the conditions as "very slick and very icy." He maintained that the icy area was large, measuring about ten feet in diameter. However, he acknowledged that it was plainly visible, and he never notified anyone at Master's or the Company of the situation on that date. To avoid the icy area, appellant walked through some bushes and on the grass to reach the entrance to his office.

Warsham recounted that, soon after his arrival at work on March 9, 2005, he was on the telephone and saw Danny High,

---

**4.** At his deposition, Mr. Muscatello estimated that approximately 100 people walk in and out of appellee's office building on a typical work day.

**5.** Appellant stated that Tim Beck, one of Master's supervisors, "told the field techs, as far as my knowledge, to not come in until *after* 10:00— from what the weather had said [sic] that day." (Emphasis added). Appellant did not specify how many field technicians were affected by the directive. Appellant claimed that it was Master's policy for technicians to contact "their supervisor," but we do not know how many supervisors Master's employed or whether their instructions differed from those of Mr. Beck.

**6.** The surname is spelled "Matthews" in appellant's deposition and "Mathews" in his answers to the interrogatories.

a Master's field technician. High, who was driving a van, was "pulling up onto the area that was frozen over," in order to access the bay area of the warehouse. Upon seeing the van drive "up on top of the ice," appellant left his office to warn High of the ice. According to appellant, he yelled to High: "Be careful not to slip on the ice."[7] High exited his vehicle without incident.

The following deposition testimony is pertinent:

[COUNSEL FOR APPELLEE]: [After you entered your office, w]hat did you do next?

[WARSHAM]: ... [I saw] someone pulling up onto the area that was frozen over. I was speaking to one of my vendors at the time that it happened. I said, look, I've got to call you right back. I said I can't believe somebody's out here.... The van pulled onto the ice.... I came out of my door, after I told my vendor I'd have to call him back, and I remember having a bucket of salt or something either inside the door or outside of the door. And I told him don't get out of the van....

* * *

[COUNSEL FOR APPELLEE]: Okay. Danny High pulled up to the bay door. When you saw him pull up, you got off the phone and the conversation with the vendor that you were on. YOU [sic] walked outside and you warned him to

---

7. For purposes of our factual summary, we shall assume the truth of appellant's assertion. We note, however, that the quotation appears on page two of appellant's brief, but it is not located on E.18, as appellant claims. Nor can we find it elsewhere in Warsham's deposition testimony. In the Memorandum of Grounds and Authorities in Support of Defendant's Motion for Summary Judgment, appellee attributes the statement to answer six of appellant's answers to interrogatories. This answer provides that, at about 6:00 a.m. on the morning of March 9, 2005, plaintiff "was placing orders on the phone with vendors and saw another employee pulling up to the warehouse to pick up material. Mr. Warsham noticed that the parking lot had not been salted and told the employee to be careful." In a circular attribution, plaintiff's Opposition to Defendant's Motion for Summary Judgment attributes the same quote to "Defendant's Memorandum at 2."

be careful due to the ice that you had seen prior to walking into the building; correct?

[WARSHAM]: Correct.

* * *

[COUNSEL FOR APPELLEE]: So [the driver] walked over [the plastic platform], walked into the supervisor's office, and you warned him to be careful about that area, correct?

[WARSHAM]: That's what I was trying—in attempts to do.

After warning the driver of the van, appellant "grabbed" a bucket of salt located near the door of the Property and proceeded to "spread" the salt with a cup, "so anyone coming into the building wouldn't slip." He began by salting the outer portion of the large icy area, because he wanted to avoid walking on the ice. When appellant got to the opposite side of the icy area, however, he decided to walk across the ice. While doing so, he fell.[8]

Appellee moved for summary judgment. It claimed, *inter alia,* that the Company did not have notice of the ice, and thus had no liability to appellant; that the condition was open and obvious, and therefore appellee owed no duty to appellant; and, as a matter of law, Warsham had assumed the risk of the condition and was contributorially negligent. As to assumption of the risk, appellee averred:

> The undisputed facts clearly demonstrate that the Plaintiff voluntarily traveled across the alleged defect. The plaintiff failed to employ the safer, alternative method of walking around the alleged defect. The Plaintiff was on notice of the alleged condition, yet failed to take the necessary steps for his own safety.

---

**8.** Appellant injured his back and eventually had surgery. He suffered an infection as a result of the surgery, which caused him to miss a year of work. Appellant claimed, *inter alia,* medical expenses of $23,178.66 and lost wages of $40,192.30.

> Since it is clear ... that Plaintiff was aware of the inherent dangers involved in walking on the ice, and voluntarily chose to expose himself to the "danger", he assumed the risk as a matter of law.... Plaintiff had options, yet, decided to subordinate his safety. It stands to reason that a person of normal intelligence who was placed in a similar situation would be aware of and also capable of appreciating the danger at hand....

At the motion hearing on May 21, 2008, appellant's counsel agreed with the court that "the facts for the most part, are not in dispute." Appellant's counsel added: "In our opposition, we don't rely on a dispute of fact to oppose the motion." Nevertheless, in challenging the motion, he argued:

> *With regard to notice.* First, the defendant did have notice of the icy condition, because the defendant was well aware that it had a problem with pooling water on its property. That's a fact not in dispute. It's a matter of nothing more than common sense that if a party is aware that it has a pooling water problem, then the party should also be aware that it will have an icing problem as soon as that water freezes. To argue that the knowledge of pooling water, combined with knowledge of freezing weather conditions, doesn't constitute constructive knowledge of the icy condition in question, is to argue that nothing can constitute constructive knowledge and it ignores basic common sense.

> \* \* \*

> [*Regarding the open and obvious issue,*] the defendant did owe the plaintiff a duty of care to exercise ordinary care to keep the premises in a reasonabl[y] safe condition, despite the fact that the condition was open and obvious.... We rely on the *Bod[d]ie v. Scott* case for that [124 Md.App. 375, 722 A.2d 407 (1999) ].

> The Court of Special Appeals in *Bod[d]ie* said that, "even when a danger is fully known and comprehended"—as we admit it was here, he saw the ice, he knew it was dangerous, he warned somebody else of it—"the plaintiff is not barred

from recovery simply because he chooses to deliberately encounter it in the following situations." One of which is specifically where the plaintiff seeks to rescue another person, or his own, or another's property which is endangered by defendant's negligence....

Now, we acknowledge that there does seem to be a split in Maryland cases between whether an open and obvious condition is regarded as, goes to the duty that's owed, or whether it goes to the defense of the assumption of the risk. And I would argue vehemently that ... the better argument is that it goes to assumption of the risk and not to whether or not there is a duty.... [I]t's better public policy to encourage people to take responsibility for cleaning up their own messes, to take responsibility for remedying dangerous conditions in the first place....

* * *

Now here, Mr. Warsham was attempting to prevent the injuries to others when he was injured himself, and the defendants admit this readily.

... [Appellee] admit[s] that this was what [appellant] was trying to do. This commendable activity of trying to help other people. So he recognizes the icy condition and went outside and salted the area. Mr. Warsham, just like in the *Bod[d]ie* case, was left only with two choices. Allowing others to be injured by the ice or possibly be injured himself by remedying the condition. Now, there might have been other choices as well. He could have maybe put up a sign or he could have stood out there all day and warned people, but whether or not those were the reasonable choices, that's a question of fact for the jury to decide and not one that should be considered as a matter of law....

Now, moving on to whether or not *assumption of the risk and contributory negligence* apply as a matter of law. Again, the *Bod[d]ie* case makes clear that neither assumption of the risk nor contributory negligence can bar Mr. Warsham's claims as a matter of law.... [I]n circumstances such as these where a plaintiff injuries [sic] himself in

attempting to prevent an injury to persons of [sic] property, the defenses of assumption of the risk and contributory negligence aren't available. And that's because in order for the assumption of the risk defense to be applicable, the plaintiff must voluntarily assume the risk. (Emphasis added).

According to appellant's counsel, the defenses of assumption of the risk and contributory negligence did not bar appellant's claims as a matter of law. Rather, counsel maintained that the viability of the defenses presented questions for a jury to decide. He also stated: "It will be [a] question of fact at the trial, as to Mr. Warsham's voluntariness." Further, appellant's counsel argued:

Had Mr. Warsham not warned others off the ice, he warned an individual to stay off the ice and then went out and salted it, other patrons could have been injured.... It's a busy parking lot.... So Mr. Warsham is left only with the choices of allowing others to be potentially injured on the ice or to be potentially injured himself in remedying the condition.

Appellee's counsel responded, in part:

The plaintiff's counsel ... is attempting to rely on the rescue doctrine here, which are cases which generally involve the risk of life or substantial peril to property. In this situation, that never existed. The testimony from Mr. Warsham alone is that this person backed up their vehicle onto this area of ice, got out of their car, he warned them, they were able to get away from that danger .... nobody ever encountered this risk after that fact. If this were a situation where Mr. Warsham came out and in the process of warning, someone slipped and fell, it would be a completely different analysis.... [Appellant] clearly appreciated the risk, was warning this individual, the peril or the danger of a risk, if it existed at all, was gone. He goes back into his building, picks up salt, which I might mention, is not his responsibility at all of [sic] this property....

\* \* \*

... [He] elects to walk across the ice when he slips and falls. It's clearly a voluntary action. There's no risk of injury to anyone at that point in time when he elects to encounter this.... He clearly had other options....

\* \* \*

... This really comes down to, did he voluntarily accept the danger. I think based on his own testimony alone, he did.... He assumed the risk as a matter of law. And the reliance on *Bod[d]ie,* even if you look at *Bod[d]ie,* it says "and when there's a reasonable safe alternative open, the plaintiff's choice of the dangerous way is a free one, and may amount to an assumption of the risk, negligence, or both." [9]

Appellant's counsel countered:

[A]ll of Defense counsel's arguments here are questions for the jury to decide. Whether or not the risk was gone, the extent of the risk that was posed. If you take all inferences in favor of Mr. Warsham as we must, the non-moving party, the inference is that there was some kind of risk. The extent of that risk is a question for the jury.

The argument's [sic] Defense counsel is making just go to the facts, how severe was the circumstance. How much of a danger was posed. And the risk wasn't gone, Your Honor.... An icy condition doesn't just, just because no one's standing there right at the moment, doesn't mean it's not a dangerous condition.

\* \* \*

And I think the underlying point here is that the *Bod[d]ie* case makes clear that Maryland law favors individuals that

---

9. With regard to contributory negligence, appellee's counsel said:
 [Appellant is] contributorially negligent as a matter of law based on his behavior in this situation. To rely on the rescue doctrine, we don't think there's any evidence whatsoever of anyone in peril, their reliance on something that may have happened is certainly not in the record.

[sic] try on their own volition to remedy the negligent conditions left by other people.... [A]s a public policy, we should encourage that. Again, he might be barred by assumption of risk and contributory negligence at trial, but as a matter of law, we shouldn't preclude him from bringing his case. He was doing a commendable thing.

In addition, appellant's counsel said:

Mr. Warsham is not the bottom level of the tier of these companies, he's a supervisor. He shows up early in the morning, he has a responsibility for other employees that are coming in, and I think that directly addresses his voluntariness where his obligation is to protect his employees and other employees, I think there are several other companies that use that parking lot, so it wasn't a choice in [sic] his part where he went out.... He actually has an obligation and a responsibility in a corporate setting to protect the health and safety of his employees.

The court ruled:

[T]he material facts at issue in this case are not in dispute. The deposition testimony of the plaintiff in this case is clear that he was aware of the dangerous condition. He knew of the ice at the time that he elected to walk on it. The rescue doctrine that's been alluded to under the *Bod[d]ie* case, deposition testimony reflects that the plaintiff warned the individual who was getting ready to walk on the ice and that the individual addressed it. And at that point after that, the plaintiff elected to go out on the ice, knowing the danger on the ice, and assumed the risk voluntarily of going onto the ice. It's clear to me from the undisputed evidence in this case and the material facts not being in dispute that the plaintiff contributed to his injuries and assumes the risk.

Therefore, the court found "as a matter of law that under the testimony and undisputed material facts, that the plaintiff was barred [by] the doctrine of assumption of risk and contributory negligence." Accordingly, it granted summary judgment in favor of appellees. Judgment was entered on May 29, 2008.

## DISCUSSION

### I.

Maryland Rule 2–501 governs summary judgment. "Summary judgment is appropriate where 'there is no genuine dispute as to any material fact' and 'the party in whose favor judgment is entered is entitled to judgment as a matter of law.' " *Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 294, 936 A.2d 343 (2007) (quoting Md. Rule 2–501(f)). In deciding whether summary judgment is appropriate, the court must " 'determine whether the parties properly generated a dispute of material fact and, if not, whether the moving party is entitled to judgment as a matter of law.' " *Wells Fargo Home Mortgage, Inc. v. Neal*, 398 Md. 705, 714, 922 A.2d 538 (2007) (citation omitted). *See also Hill v. Knapp*, 396 Md. 700, 711, 914 A.2d 1193 (2007). "A material fact is a fact that, depending on how it is decided by the trier of fact, will affect the outcome of the case." *Mandl v. Bailey*, 159 Md.App. 64, 82, 858 A.2d 508 (2004); *see Arroyo v. Bd. of Educ. of Howard County*, 381 Md. 646, 654, 851 A.2d 576 (2004).

The party opposing a motion for summary judgment must show disputed material facts with precision in order to prevent the entry of summary judgment. *Ecology Servs. v. Clym Envtl. Servs., LLC*, 181 Md.App. 1, 11–12, 952 A.2d 999, *cert. denied*, 406 Md. 444, 959 A.2d 793 (2008). Put another way, summary judgment is not defeated by "bare allegations or 'a mere scintilla' of evidence." *Labor Ready, Inc. v. Abis*, 137 Md.App. 116, 125, 767 A.2d 936 (2001) (quoting *Helman v. Kim*, 130 Md.App. 181, 192, 745 A.2d 451 (2000)) (citation omitted); *see also Beatty v. Trailmaster Prods., Inc.*, 330 Md. 726, 738, 625 A.2d 1005 (1993) ("[T]he party opposing summary judgment 'must do more than simply show there is some metaphysical doubt as to the material facts.' ") (citation omitted).

In determining whether the trial court correctly entered summary judgment as a matter of law, we apply a *de novo* standard of review. *See Conaway v. Deane*, 401 Md. 219, 243,

932 A.2d 571 (2007); *Harford County v. Saks Fifth Ave. Distrib. Co.,* 399 Md. 73, 82 (2007); *Prop. & Cas. Ins. Guar. Corp. v. Yanni,* 397 Md. 474, 480, 919 A.2d 1 (2007); *Standard Fire Ins. Co. v. Berrett,* 395 Md. 439, 450, 910 A.2d 1072 (2006). Like the trial court, we must make "the threshold determination as to whether a genuine dispute of material fact exists." *Remsburg v. Montgomery,* 376 Md. 568, 579, 831 A.2d 18 (2003). If we are satisfied that there was no genuine issue of material fact, then we must determine if the trial court " 'reached the correct legal result.' " *Crews v. Hollenbach,* 126 Md.App. 609, 625, 730 A.2d 742 (1999) (citation omitted), *aff'd,* 358 Md. 627, 751 A.2d 481 (2000); *see Anderson v. Council of Unit Owners of Gables on Tuckerman Condo.,* 404 Md. 560, 571, 948 A.2d 11 (2008); *Knapp,* 396 Md. at 711, 914 A.2d 1193. "We review the record in the light most favorable to the non-moving party and construe any reasonable inferences that may be drawn from the facts against the moving party." *Educ. Testing Serv. v. Hildebrant,* 399 Md. 128, 140, 923 A.2d 34 (2007); *see also Newell v. Runnels,* 407 Md. 578, 607, 967 A.2d 729 (2009); *Rhoads v. Sommer,* 401 Md. 131, 148, 931 A.2d 508 (2007); *Saks Fifth Ave.,* 399 Md. at 82, 923 A.2d 1; *Lovelace v. Anderson,* 366 Md. 690, 695, 785 A.2d 726 (2001). "If the facts are subject to more than one inference, those inferences should be submitted to the trier of fact." *Hill,* 402 Md. at 294, 936 A.2d 343.

 Ordinarily, on review of a grant of summary judgment, an appellate court may " 'uphold the grant of a summary judgment only on the grounds relied on by the trial court.' " *Pulte Home Corp. v. Parex, Inc.,* 174 Md.App. 681, 711, 923 A.2d 971 (2007) (citations omitted), *aff'd,* 403 Md. 367, 942 A.2d 722 (2008); *see Newell,* 407 Md. at 608, 967 A.2d 729; *Gourdine v. Crews,* 405 Md. 722, 736, 955 A.2d 769 (2008); *Gross v. Sussex,* 332 Md. 247, 254 n. 3, 630 A.2d 1156 (1993); *Select Express, LLC v. Am. Trade Bindery, Inc.,* 178 Md.App. 607, 612–13, 943 A.2d 90 (2008). However, " '[i]f the alternative ground is one upon which the circuit court would have had no discretion to deny summary judgment, summary judgment may be granted for a reason not relied on by the trial court.' "

*Dixon v. Dep't of Pub. Safety & Corr. Servs.,* 175 Md.App. 384, 418 n. 18, 927 A.2d 445 (2007) (citation omitted). Further, "[w]hen a motion is based solely upon 'a pure issue of law that could not properly be submitted to a trier of fact,' then 'we will affirm on an alternative ground.'" *Wash. Mut. Bank v. Homan,* 186 Md.App. 372, 388, 974 A.2d 376 (2009) (citation omitted).

## II.

Appellant contends that the court erred in granting summary judgment to appellee. He insists that the defenses of assumption of the risk and contributory negligence do not bar his suit, because he "was left only with the choices of allowing others to be injured by the ice or to possibly be injured himself in remedying the condition." Further, appellant asserts:

> In circumstances where a person is injured while attempting to save people or property from a peril created by another's negligence, the fact that the danger was open and obvious does not negate the plaintiff's claims, and the defenses of assumption of the risk and contributory negligence do not apply.

Appellant elaborates:

> Had Mr. Warsham not warned others of the ice and salted the ice, several other patrons or employees could have been injured and Mr. Warsham had to act quickly to prevent this. Soon other people—employees and customers—would have arrived in the parking lot and encountered the ice.

Appellant concedes that, because he saw the icy condition, "[s]uch circumstances normally present a clear assumption of the risk and/or contributory negligence defense." But, he asserts: "[B]ecause Mr. Warsham had only the choices of risking his own safety or allowing others to slip on the ice, and because he was actually attempting to prevent injuries to others at the time he was injured, the fact that the condition was obvious does not bar his recovery." Under these circumstances, argues appellant, "the 'voluntariness' element, neces-

sary for both the assumption of the risk and contributory negligence defenses, is absent."

Moreover, appellant urges this Court to "embrace a public policy that encourages people like Mr. Warsham to take on some personal risk in order to prevent harm to others . . ." He posits:

There is sufficient evidence in this record, construing the facts in the light most favorable to Mr. Warsham, as this Court must, for a jury to find (1) that Mr. Warsham was attempting to avert harm to people that would be caused by the icy condition negligently left by Muscatello and (2) that Mr. Warsham did not act unreasonably under the circumstances in his attempt to salt the ice.

The Company counters that "the circuit court properly granted Muscatello's motion for summary judgment." It maintains that, in the light most favorable to appellant, "the undisputed evidence" demonstrated that, "as a matter of law, his negligence contributed to his injuries and that he assumed the risk of injury as a matter of law."

Noting that appellant knew and appreciated the risk of slipping on the ice, appellee claims that the "emergency" or "rescue" doctrine does not excuse appellant's decision to traverse the ice, because there was no "emergency in progress" when appellant chose to walk on the ice. Asserting that "[n]o one was in imminent danger" when appellant undertook to salt the ice, appellee contends that appellant was merely worried about a future danger. The landlord elaborates:

[B]oth Warsham and the field technician had arrived at work and made it into the building without transversing [sic] the icy patch. Warsham also explained that the field supervisor had been into work and left already that morning before his slip and fall. . . . Warsham's understanding was that the other field technicians had been told not to report to work until after 10:00 a.m.—several hours after the slip and fall occurred. There simply was no "emergency situation" to "justify" or "compel" Warsham's walking across the ice.

In addition, appellee maintains that appellant had other options available to him. It posits:

Warsham could have chosen to pick up the telephone and notify the premises owner, Muscatello, of the icy conditions. He could have posted a warning sign. He could have stood next to the icy patch and warned anyone arriving of the danger. He could have only thrown salt from the side of the icy area and not chosen to walk across it.

Alternatively, appellee contends that summary judgment was proper because there was no evidence that appellee breached a duty of care to appellant. In particular, appellee asserts that it owed no duty to appellant because appellee did not have notice that the parking lot was icy. In addition, appellee argues that it is not liable to appellant because the "icy condition was open and obvious."

In reply, appellant argues: "There is no requirement of an emergency in progress and the circumstances confronting Mr. Warsham were sufficiently exigent to justify his actions." Insisting that imminent danger was not necessary to render his conduct involuntary, appellant posits that there is a "continuum of dangerous situations that affect the voluntariness element of the assumption of the risk defense."

In support of his argument that he acted out of urgency, because of "a very real possibility of someone slipping and injuring themselves," appellant points to the following: the icy patch was large, measuring about 10-feet in diameter; the parking lot was busiest in the morning; approximately 100 people cross the lot each day; and appellant decided to salt the ice when he saw the field technician put himself at risk by parking on the icy patch. According to appellant, the exigent circumstances "compelled [him] to do the most rational and effective thing possible—salt the ice immediately, because salt takes time to work."

In addition, appellant maintains that this case does not just present "an amorphous risk possibly realized in the distant future, but rather a distinct risk of slippery ice, the definite return of the van driver, and the fact that roughly 100 people

would traverse that area that day." He insists that, if the court concludes that these circumstances do not "present a sufficient exigency," then "no icy condition ever could, and Marylanders will be discouraged from remedying such icy conditions."

Further, appellant maintains that, because the Company had notice of the accumulation of water in the parking lot, and because the weather was cold, appellee had constructive and actual knowledge of the icy condition. Indeed, he maintains that because the incident occurred in March, "Muscatello had all winter to see the ice and realize that the pooling water problem was an icing problem too."

## III.

In Maryland, assumption of the risk is an affirmative defense that completely bars a plaintiff's recovery. *Crews, supra,* 358 Md. at 640, 751 A.2d 481.[10] The assumption of the risk doctrine "is grounded on the theory that a plaintiff who voluntarily consents, either expressly or impliedly, to exposure to a known risk cannot later sue for damages incurred from exposure to that risk." *Id.; see also ADM P'ship v. Martin,* 348 Md. 84, 90, 702 A.2d 730 (1997).

The requirements for assumption of the risk are well settled. *ADM P'ship,* 348 Md. at 90–91, 702 A.2d 730. "[T]o establish the defense of assumption of risk, the defendant must show that the plaintiff: (1) had knowledge of the risk of the danger; (2) appreciated that risk; and (3) voluntarily confronted the risk of danger." *Id.; see also Neal v. Prince George's County,* 117 Md.App. 460, 466, 700 A.2d 838, *vacated on other grounds,* 348 Md. 329, 703 A.2d 656 (1997), *cert. denied after remand,* 350 Md. 277, 711 A.2d 869 (1998).

---

10. Similarly, contributory negligence, if proved, is a complete defense that bars a plaintiff's recovery in a negligence action. *See Kassama v. Magat,* 136 Md.App. 637, 657, 767 A.2d 348 (2001), *aff'd,* 368 Md. 113, 792 A.2d 1102 (2002). Based on our resolution of this case, we need not address the doctrine of contributory negligence.

Assumption of the risk will apply only if " 'the undisputed evidence and all permissible inferences therefrom *clearly* establish that the risk of danger was *fully* known to and *understood* by the plaintiff.' " *Schroyer v. McNeal,* 323 Md. 275, 283, 592 A.2d 1119 (1991) (quoting *Kasten Constr. Co. v. Evans,* 260 Md. 536, 544, 273 A.2d 90 (1971) (emphasis in *Kasten* )). An objective standard is used to determine whether the risk was appreciated and understood and whether the action was voluntary. *Morgan State Univ. v. Walker,* 397 Md. 509, 515, 919 A.2d 21 (2007); *ADM P'ship,* 348 Md. at 91, 702 A.2d 730.

Unlike contributory negligence, assumption of the risk does not require a finding that the plaintiff was negligent. *Schroyer,* 323 Md. at 282–83, 592 A.2d 1119. The fact that the plaintiff was aware of the risk, and voluntarily undertook the risk, is sufficient. *Id.* at 283, 592 A.2d 1119. Put another way, when an individual assumes a risk, the individual's voluntary action showing a willingness to take a chance supersedes any duty the defendant owed the plaintiff to act reasonably for the plaintiff's safety. *Id.* at 282, 592 A.2d 1119; *see also Prudential Secs. v. E-Net, Inc.,* 140 Md.App. 194, 226–27, 780 A.2d 359 (2001).

Ordinarily, it is for the jury to determine whether a plaintiff knew of the danger, appreciated the risk, and acted voluntarily. W. KEETON, D. DOBBS, R. KEETON, & D. OWEN, PROSSER AND KEETON ON THE LAW OF TORTS § 68, 487 (5th ed.1984) (hereinafter PROSSER AND KEETON); *see also Crews,* 358 Md. at 644, 751 A.2d 481; *Miller v. Michalek,* 13 Md.App. 16, 23, 281 A.2d 117 (1971). "On the other hand, when it is clear that a person of normal intelligence in the position of the plaintiff must have understood the danger, the issue [concerning knowledge, appreciation of the danger and voluntariness] is for the court." *Schroyer,* 323 Md. at 283–84, 592 A.2d 1119 (citations omitted); *see Crews,* 126 Md.App. at 628–29, 730 A.2d 742.

Notably, the danger of slipping on ice has been identified as one of the risks that anyone of adult age would

appreciate. *ADM P'ship*, 348 Md. at 92, 702 A.2d 730; *Schroyer*, 323 Md. at 284, 592 A.2d 1119; *see also Allen v. Marriott Worldwide Corp.*, 183 Md.App. 460, 464, 961 A.2d 1141 (2008) (plaintiff voluntarily assumed the risk of falling on invisible black ice because the surrounding circumstances suggested that ice might be present), *cert. denied,* 408 Md. 149, 968 A.2d 1065 (2009). In this case, appellant concedes that he knew of the danger and appreciated the risk of slipping on the ice. The crux of the parties' disagreement pertains to the element of voluntariness. Appellant maintains that he generated a dispute of material fact as to the voluntariness of his conduct in salting the ice. In essence, he claims that because he acted as a good Samaritan to protect the safety of others, his conduct was not voluntary within the meaning of the assumption of the risk doctrine.

 An individual voluntarily assumes a risk only if the individual's freedom of choice is not constrained by the existing circumstances or the appellee's coercion. *ADM P'ship,* 348 Md. at 92, 702 A.2d 730; *see also Schroyer,* 323 Md. at 283, 592 A.2d 1119. Put another way, "the risk is not assumed where the conduct of the defendant has left him no reasonable alternative." *ADM P'ship,* 348 Md. at 92–93, 702 A.2d 730; *see also Boddie v. Scott,* 124 Md.App. 375, 381, 722 A.2d 407 (1999). As the Court explained in *ADM P'ship,* 348 Md. at 93, 702 A.2d 730, "Where the defendant puts him to a choice of evils, there is a species of duress, which destroys the idea of freedom of election." (Citing PROSSER AND KEETON § 68 at 490–91). However, when the plaintiff is compelled "by his own necessities to accept a danger, the situation is not to be charged against the defendant." *ADM P'ship.,* 348 Md. at 93, 702 A.2d 730.

The issue of voluntariness in the slip and fall context has been the subject of several appellate opinions. For example, a deliveryman injured while bringing kitchen sink tops to a partially constructed house was deemed to have voluntarily assumed the risk of slipping when he walked on a makeshift bridge of two plywood boards overlying an excavation site.

*See Burke v. Williams,* 244 Md. 154, 156–58, 223 A.2d 187 (1966). There, the Court of Appeals rejected appellant's argument that he did not assume the risk because the appellee only provided one means of ingress and egress. *Id.* at 157–58, 223 A.2d 187. The appellant's argument failed because no one required the worker to walk over the plywood, nor was there evidence that his job would have been jeopardized if he had left the sinks outside the house. *Id.* at 158, 223 A.2d 187. Rather, the appellant took it upon himself to carry the sinks into the house. *Id.*

Similarly, the plaintiff-employee in *ADM P'ship, supra,* 348 Md. at 88, 702 A.2d 730, fell on an icy walkway as she made a delivery to a business owned by the defendants. The employee acknowledged that she could have returned to her truck and radioed her employer that it was too dangerous to complete the assigned task. *Id.* at 99, 702 A.2d 730. The Court determined there was "no evidence" that the plaintiff's "act of traversing the ice and snow covered parking lot and walkway was not volitional." *Id.* To the contrary, it determined that the plaintiff assumed the risk of falling on ice. *Id.* at 103, 702 A.2d 730. *See also Velte v. Nichols,* 211 Md. 353, 354–56, 127 A.2d 544 (1956) (purchaser assumed the risk when he climbed a ladder, although he was told to do so by the merchant).

*Rountree v. Lerner Development Co.,* 52 Md.App. 281, 447 A.2d 902 (1982), provides guidance. In *Rountree,* the plaintiff was injured when she fell on an ice-covered step outside her apartment building. *Id.* at 282, 447 A.2d 902. On the day of her injury, the plaintiff awoke and "noticed an accumulation of ice and snow" from her balcony. *Id.* at 283, 447 A.2d 902. The plaintiff, who was due at work, exited the building "with great caution." *Id.* She claimed, however, that she had no choice but to use the steps, even though she knew they were "slick and icy," and "there was no handrail or grip to aid her in ascending the stairs." *Id.* The trial court granted the defendant's motion for directed verdict, "ruling as a matter of law that the appellant had assumed the risk of her fall." *Id.* at 282, 447 A.2d 902.

Writing for this Court, Judge Moylan reversed. The Court concluded that the plaintiff presented a jury issue with respect to whether she assumed the risk. *Id.* at 284, 447 A.2d 902. The Court said, *id.* at 285–86, 447 A.2d 902:

On the facts of this case, there may have been clear and decisive evidence of a "deliberate encountering of a known danger" but that fact, even if assumed to be true, is not dispositive of the issue of assumption of risk. In this case, the tenant had a right to egress from her apartment. She had a right to assume that the landlord would take all appropriate steps to make safe egress possible. Whether the landlord did or did not is another issue and not the one upon which this case was decided. There was evidence that the appellant delayed her departure for work so that both the sun and the workmen would have additional time to ameliorate the icy conditions. There was evidence that there was no alternative route of egress from the appellant's apartment. . . .

\* \* \*

If there had been evidence in this case that there was a reasonable and safe alternative route of egress open to the appellant and that she deliberately chose the shorter but more dangerous route, that might well establish as a matter of law that she was guilty of having assumed the risk. . . .

*Schroyer,* 323 Md. 275, 592 A.2d 1119, is also instructive. Upon registering at the hotel, the plaintiff requested a room near the west entrance, because she had "to 'cart' boxes and paperwork back and forth to her room," and wanted to be near the exit. *Id.* at 278, 592 A.2d 1119. However, she was aware that this particular area of the parking lot had not yet been shoveled. *Id.* The hotel complied with her request, "notwithstanding the hotel's policy of not assigning such rooms during inclement weather." *Id.* After exiting from her car, the plaintiff again "noticed that the sidewalk near the entrance had not been shoveled and, furthermore, that the area was slippery." *Id.* at 278–79, 592 A.2d 1119. She "crossed the ice and snow carefully, and without mishap." *Id.*

at 279, 592 A.2d 1119. Nevertheless, she slipped and injured herself when she returned to her car to retrieve her remaining belongings. *Id.* The Court concluded that the plaintiff assumed the risk of slipping on the ice. *Id.* at 288–89, 592 A.2d 1119.

Similarly, in *Morgan State, supra,* 397 Md. 509, 919 A.2d 21, the Court again held that the plaintiff assumed the risk of falling on the ice. *Id.* at 510, 919 A.2d 21. In that case, the mother of a college student drove to the school several days after a snowstorm, traveling almost an hour, because her daughter needed money for gas and other things, and had no ATM card or debit card. *Id.* at 511, 919 A.2d 21. After parking in the school parking lot, the plaintiff exited her vehicle and fell on the ice. *Id.* Writing for the Court of Appeals, Judge Greene stated:

> Nothing in the record suggests that Respondent was forced against her will to confront the risk of danger of walking on the snow and ice, such that her behavior could be classified as involuntarily. After hearing the crunch of ice and snow under her tires and acknowledging that [Morgan] had not removed the ice and snow from the parking lot, she proceeded to get out of her car and visit with her daughter. Respondent's motivation stemmed from the fact that she believed that her daughter needed money. In accordance with our prior holdings, [her] actions would be considered involuntary only if she lacked the free will to avoid the situation.

*Id.* at 519–20, 919 A.2d 21 (citations omitted).

Of import here, the Court emphasized that the plaintiff had alternatives, one of which might be regarded as harsh. It stated: "[S]he could have turned her car around and gone home or arranged an alternative plan by which to get her daughter money, instead of voluntarily proceeding in the face of danger . . ." *Id.* at 520, 919 A.2d 21.

More recently, in *Allen, supra,* 183 Md.App. at 462, 961 A.2d 1141, the plaintiff slipped on "black ice" in a parking lot. The trial court determined that the plaintiff assumed the risk

and granted summary judgment in favor of the defendant, in whose parking lot the plaintiff had fallen. *Id.* at 462–63, 961 A.2d 1141. This Court affirmed, stating, *id.* at 479, 961 A.2d 1141: "The ultimate issue ... is not the subjective question of whether this appellant was consciously aware of the risk as he ventured out onto the parking lot ..., but the objective question of whether a reasonable person, knowing what the appellant knew, would have been aware of the risk." We reasoned, *id.* at 477, 961 A.2d 1141:

> On the morning of the fall, the appellant abandoned a position of safety at the front entrance, where automobile passengers could be safely picked up or dropped off, and voluntarily ventured out onto the parking lot for the apparent purpose of saving a little time.... He knew that it was eight o'clock in the morning and he acknowledged that the temperature had been below freezing overnight. The danger posed by melting and refreezing was clear. The appellant himself stated that although he had reason to believe the sidewalk had been salted or otherwise treated, he had no reason to believe that the parking lot itself had been so treated.

With the exception of *Rountree*, the cases discussed above suggest that our appellate courts have strictly applied the doctrine of assumption of the risk in suits brought by persons who were injured when they fell on ice that was plainly visible. Nevertheless, appellant contends that, under the circumstances of this case, the defense does not bar his claim because his conduct was the result of his effort to safeguard the lives of others.

 To be sure, there is a narrowly chiseled exception to the defense of assumption of the risk, sometimes called "the rescue doctrine." The exception, which focuses on the element of voluntariness, applies to emergency situations involving imminent peril, in which an individual acts to save the life or property of another. *See Boddie*, 124 Md.App. at 382–83, 722 A.2d 407. Appellant contends that *Schroyer, ADM Partnership, Morgan State,* and *Allen, supra,* are inapposite here,

because they did not "address the circumstances ... where a person slips and falls on ice while attempting to salt the ice so that others are not injured."

In support of his position, appellant quotes *Boddie*, 124 Md.App. at 383, 722 A.2d 407, for the principles that " 'it is commendable to save life' " and " 'a person who endeavors to avert the consequences of the negligence of another person, by an act which is dangerous but not reckless, is not precluded from recovering damages for injury suffered as a consequence of having interposed.' " To do otherwise, suggests appellant, would "discourage[ ] those within [Maryland's] borders from correcting known dangerous conditions."

We pause to review *Boddie*. There, an electrician was severely injured while trying to assist a homeowner with a kitchen fire negligently caused by the homeowner, who left oil cooking on the stove. *Id.* at 377–78, 722 A.2d 407. Upon discovering the fire, the homeowner screamed for the electrician, who was repairing a defective outlet, saying: " 'Please, sir, come help me, my house is on fire.' " *Id.* at 378, 722 A.2d 407. The electrician ran to the kitchen and observed flames " 'towering all the way up to the ceiling.' " *Id.* As the homeowner stood " 'scared' " and silent, the electrician wrapped newspaper around the handle of the pan, walked "briskly towards the front door," and then "hurled the flaming pan" outside. *Id.* In the process, the electrician was severely injured. *Id.* at 379, 722 A.2d 407.

In the electrician's negligence suit against the homeowner, the homeowner defended based on assumption of risk. Although the electrician had knowledge of and appreciated the danger, we concluded that he did not voluntarily assume the risk of injury. *Id.* at 388–89, 722 A.2d 407. The Court explained that "the risk is not assumed where the conduct of the defendant has left him no reasonable alternative." *Id.* at 381, 722 A.2d 407. However, we underscored that, for this principle to apply, the circumstances must create "such a situation as to justify if not to compel the plaintiff to undergo the risk of being injured in order to warn others and avert

their harm." *Id.* at 382, 722 A.2d 407 (citing *People's Drug Stores v. Windham,* 178 Md. 172, 12 A.2d 532 (1940)).

The *Boddie* Court concluded that, when the evidence was taken "in the light most favorable to" the plaintiff,

> [he] did not voluntarily assume the risk of injury when he picked up the frying pan because there was sufficient evidence from which the jury could find that (1) he was attempting to avert harm to the defendant's property caused by defendant's negligence and (2) he did not act unreasonably under the emergency conditions he faced.

*Boddie,* 124 Md.App. at 388–89, 722 A.2d 407 (footnotes omitted).

In its discussion, the Court quoted PROSSER AND KEETON, § 68 at 491. *See Boddie,* 124 Md.App. at 381–82, 722 A.2d 407. The authors of the treatise cautioned, § 68 at 491:

> Those who dash in to save their own property, or the lives or property of others, from a peril created by the defendant's negligence, do not assume the risk where the alternative is to allow the threatened harm to occur. In all of these cases, of course, *the danger may be out of all proportion to the value of any benefits involved, and so the plaintiff may be charged with contributory negligence for unreasonably choosing to confront the risk. And where there is a reasonably safe alternative open, the plaintiff's choice of the dangerous way is a free one, and may amount to assumption of risk, negligence or both.*

(Footnotes omitted; emphasis added).

▮ Thus, a plaintiff who acts to rescue others is not necessarily shielded from the defenses of assumption of the risk and contributory negligence. Rather, as PROSSER AND KEETON make clear, the defense remains viable if the dangerous conduct undertaken by the plaintiff is disproportionate to the benefit, or if there was a reasonably safe alternative available to the plaintiff. *See Boddie,* 124 Md.App. at 388 n. 3, 722 A.2d 407 ("Under some circumstances, a plaintiff's action might, of course, be unreasonable as a matter of law, e.g., if a man rushed into a burning building to save his hat.")

Appellant acknowledges that *Boddie* is distinguishable from the case *sub judice* by "the degree of the exigency faced by the electrician in *Boddie.*" He contends, however, that "the exigent nature of the circumstances in *Boddie* was not a factor in this Court's holding." He explains:

> The Court instead relied on (1) the fact that the defendant created the danger, and (2) the fact that the plaintiff was left with the Hobson's choice of either helping and risking injury to himself or not helping, not risking injury to himself, and letting the property damage happen.

In any event, argues appellant, he did face an emergency. Therefore, he urges this Court to "embrace a public policy that encourages people ... to take on some personal risk in order to prevent harm to others...." Appellant posits:

> Had Mr. Warsham not warned others of the ice and salted the ice, several other patrons or employees could have been injured and Mr. Warsham had to act quickly to prevent this. Soon other people—employees and customers—would have arrived in the parking lot and encountered the ice.

Warsham also relies on four cases cited by *Boddie* in support of the principle that "it is commendable to save life": *Maryland Steel Co. v. Marney,* 88 Md. 482, 42 A. 60 (1898); *American Express Co. v. Terry,* 126 Md. 254, 94 A. 1026 (1915); *State, to the use of Dove v. Mayor of Baltimore,* 141 Md. 344, 118 A. 753 (1922); and *Lashley v. Dawson,* 162 Md. 549, 160 A. 738 (1932). Although all four cases discussed contributory negligence, rather than assumption of the risk, they are informative.

In *American Express Co.,* 126 Md. 254, 94 A. 1026 (1915), for example, the plaintiff was crossing the street when he noticed an electric truck moving in the wrong direction on a busy street, with no one in control of it, and heading for an area where the plaintiff had seen men congregating with their horses and wagons. *Id.* at 255–56, 94 A. 1026. The plaintiff was injured when he jumped in the truck to try to stop it. *Id.* at 256–57, 94 A. 1026. The Court upheld the judgment for plaintiff, despite the defendant's contention that the trial court

should have found as a matter of law that "the plaintiff was not justified in his attempt to stop the truck, and that his intervention constituted contributory negligence." *Id.* at 262, 94 A. 1026.

In *Lashley,* 162 Md. 549, 160 A. 738, a bus was "squarely across the entire road, in such a position that its exterior lights were not visible to persons on the road, and ... though the [bus] driver saw an automobile approaching, he did not blow his horn ..." *Id.* Upon seeing an approaching vehicle, the plaintiff, a recent passenger on the bus, attempted to warn of the bus by lighting a match while in the middle of the street. The plaintiff then jumped into a ditch on the side of the road. *Id.* at 551–52, 160 A. 738. The approaching vehicle struck the plaintiff. *Id.* at 552, 160 A. 738. The plaintiff sued the owner and operator of the bus based on the driver's negligence. *Id.* at 551–53, 160 A. 738. The Court declared, *id.* at 565, 160 A. 738, that "it cannot be said that" the plaintiff's

> conduct in remaining as near the bus as he was when he was struck was so rash or so reckless as to amount to negligence as a matter of law. He knew at the time of the accident that the bus was dimly visible, if at all, to one traveling over the highway, he saw [the] car ... and believed that, if it were not stopped, an accident was inevitable. In that emergency he attempted to warn [the car's driver] of the danger by lighting a match, and in so doing remained in a position of danger longer than was consistent with his own safety. But before the accident he had retreated to what seemed to him at the time to be a safe place, he was entirely off the traveled roadway, and his failure, under the stress of the sudden emergency which confronted him, to anticipate with unerring prescience the sequence of events which followed, is insufficient to charge him with negligence as a matter of law.

In discussing negligence, the *Lashley* Court stated, *id.* at 564–65, 160 A. 738 (citation omitted):

[T]he law measures acts done under the spur and stress of sudden emergencies . . ., when done for the purpose of averting serious or even fatal consequences to others, with more indulgence than where they are impelled by no such motive. To constitute negligence as a matter of law, the act relied upon must present some feature of reckless indifference to one's own safety, which leaves no room for ordinary minds to differ as to its quality.

In *State, to the use of Dove, supra,* 141 Md. 344, 118 A. 753, the decedent was walking down the street when he noticed an electric wire had fallen off a pole, in and over a gutter, and over some branches. *Id.* at 346, 118 A. 753. The insulation was off the wire and, where it was resting on the gutter, it was sparking. *Id.* The decedent saw a group of children playing on the sidewalk, poking the wire with sticks. *Id.* The decedent was electrocuted when he attempted to push the wire away from the children. *Id.* at 347, 118 A. 753. Suit was instituted against the Chesapeake and Potomac Telephone Company ("C & P"), the Mayor and City Council of Baltimore, and the Consolidated Gas Electric Light and Power Company, based on the defendants' negligence. *Id.* at 345, 118 A. 753. It was dismissed as to C & P, and a judgment was rendered for the remaining defendants. *Id.* A single question was presented on appeal: "Was the conduct of the deceased of such a reckless character that the Court must declare him to have been guilty of contributory negligence as a matter of law? Or were the circumstances such as to leave room for a difference of opinion among reasonable men as to whether he was justified in taking the risk he took?" *Id.* at 345–46, 118 A. 753.

In reversing the trial court, the *Dove* Court noted that, "under ordinary circumstances, and with time for consideration, prudence would have dictated a careful examination of the wire before attempting to handle it with naked hands. But the conditions existing there appeared to Dove to require immediate action." *Id.* at 347, 118 A. 753. Holding that the "question of contributory negligence should have been submitted to the jury," *id.,* the Court stated:

"When one risks his life, or places himself in a position of great danger in an effort to save the life of another, or to protect another who is exposed to a sudden peril, or in danger of great bodily harm, such exposure and risk for such purpose is not negligence."

*Id.* (quoting CHARLES FISK BEACH, A TREATISE ON THE LAW OF CONTRIBUTORY NEGLIGENCE 45 (1885)).

*Maryland Steel Co., supra,* 88 Md. 482, 42 A. 60, is to the same effect. There, the Court stated, *id.* at 497–98, 42 A. 60: "When one risks his life, or places himself in a position of great danger in an effort to save the life of another, or to protect another who is exposed to a sudden peril, or in danger of great bodily harm, such exposure and risk for such purpose is not negligence." *See also id.* at 498, 42 A. 60 ("The law has so high a regard for human life that it will not impute negligence to an effort to preserve it, unless made under such circumstances as to constitute rashness in the judgment of prudent persons.")

*Scott v. John H. Hampshire, Inc.,* 246 Md. 171, 227 A.2d 751 (1967), is also noteworthy. There, the plaintiff, a former crane operator, was employed as an ironworker to construct a library. *Id.* at 173–74, 227 A.2d 751. While working on the building's roof, he observed crane operators, who were employed by another contractor, improperly operating the crane by dangerously overloading the chain. *Id.* at 174, 227 A.2d 751. The plaintiff descended from the roof to warn individuals in proximity of the crane about the danger. *Id.* The chain then broke and struck the plaintiff while he was standing about twenty feet from the crane. *Id.* The Court held that neither assumption of the risk nor contributory negligence "is applicable in this case where the conduct of the defendant appears to have created such a situation as to justify if not to compel the plaintiff to undergo the risk of being injured in order to warn others and avert their harm." *Id.* at 175, 227 A.2d 751 (citations omitted).

Based on appellant's review of these cases, he maintains: (1) "Mr. Warsham is not required to demonstrate imminent

peril to particular individuals in order to prevail; (2) real appreciable endangerment is required; and (3) there is a common theme of examining what is 'reasonable under the circumstances.'" As we see it, the cases discussed above are factually distinguishable from the one at bar, based on the degree of exigency at issue in those cases. As appellee points out, the cases discussed above that applied the exception all involved imminent risks of serious harm, rather than "situations where a dangerous condition or emergency *might arise* in the future." We agree with appellee.

The cases that have applied an exception to assumption of the risk (or contributory negligence) have done so when the risk of loss of life or property was impending. Moreover, the extent of exigency faced by appellant was hardly comparable to the magnitude of the exigency in *Boddie,* where a conflagration was in progress, or the four cases cited by Boddie.[11] In short, there was no "emergency in progress" here. Indeed, the icy patch was plainly visible, so others who might arrive would see it and realize that they had to be cautious.

Appellant contends that the facts here "do not present an amorphous risk possibly realized in the distant future, but rather a distinct risk of slippery ice, the definite return of the van driver, and the fact that roughly 100 people would traverse that area that day." Yet, no one cried out to appellant for help or was even in harm's way when appellant undertook the risk of walking on the ice. At most, appellant anticipated the arrival of others at the parking lot, who might then encounter the icy surface.

---

11. Appellant also cites several foreign cases on the "less exigent end of the continuum," including *Henshaw v. Belyea,* 220 Cal. 458, 31 P.2d 348 (1934) (employee injured when he attempted to stop a truck from sliding down a hill); *Thoresen v. St. Paul & Tacoma Lumber Co.,* 73 Wash. 99, 131 P. 645 (1913) (stevedore loading lumber onto a ship was injured when he tried to stop the loaded lumber car sliding down an incline); *Hollaran v. City of New York,* 168 A.D. 469, 153 N.Y.S. 447 (1915) (deceased unsuccessfully tried to grab the reins of a team of horses galloping along a busy urban street).

Moreover, appellant never claimed that his job required him to salt the ice and that he risked being fired if he did not do so. And, unlike the plaintiff in *Boddie,* who did not have a reasonable alternative to the immediate and grave exigency, appellant had reasonable alternatives available to him. These included throwing salt onto the ice from the safety of the grass; contacting appellee or the maintenance employees; posting a sign; blocking access to the icy area; or standing near the icy patch to alert others of the danger. *See Morgan State,* 397 Md. at 520, 919 A.2d 21. A plaintiff is not protected from the defense of assumption of the risk for "unreasonably choosing to confront the risk" when "there is a reasonably safe alternative...." PROSSER AND KEETON § 68 at 491.

In sum, appellant's decision to walk across the ice was not compelled by the circumstances. Rather, we agree with the circuit court that, as a matter of law, his conduct was voluntary. If the exception to the defense of assumption of the risk were broadened to include situations such as the one here, we would begin a slippery descent along a slope where any well-intentioned action is shielded from the defense.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**